697 So.2d 280 (1997)
Gerard W. RAMOS
v.
Marianne Murdock RAMOS.
No. 97-CA-143.
Court of Appeal of Louisiana, Fifth Circuit.
June 2, 1997.
*281 Bennett Wolff, Wolff & Wolff, New Orleans, for Plaintiff/Appellee.
*282 Robert E. Arceneaux, Travis L. Bourgeois, Barham & Arceneaux, A Professional Law Corporation, New Orleans, for Defendant/Appellant.
Before GAUDIN, GRISBAUM and WICKER, JJ.
WICKER, Judge.
This appeal arises from a judgment denying a motion to take the minor child out of Louisiana in order to reside in California. Gerard W. Ramos (Gerard), plaintiff/appellee, and Marianne Murdock Ramos (Marianne), defendant/appellant, were divorced December 7, 1995. On August 21, 1995 the parties dictated a consent agreement into the record whereby they agreed to joint custody of the minor child, Patrick Ramos (Patrick), with Marianne designated as the domiciliary parent. Patrick was born December 21, 1990 and was five years of age at the time of trial. On January 16, 1996 Gerard filed a motion to enjoin Marianne from taking Patrick with her to reside in California.[1] On May 2, 1996 Marianne filed a motion to take the minor child out of the state. She married Robert Whelan (Whelan) on March 21, 1996. She alleged Whelan was relocating to California and that the relocation would offer economic and employment opportunities for both her and her husband. The trial judge heard the motion to enjoin the move and the motion to allow Marianne to remove the child to California over five non-consecutive days beginning June 21, 1996. On September 12, 1996 the trial judge denied Marianne's motion.[2] Marianne now appeals. We affirm and lift two previously ordered stays of the proceedings. We remand Gerard's motion to set Summer visitation.
MOTION TO SET SUMMER VISITATION
On May 23, 1997 Gerard filed a motion seeking to have this court set visitation for Summer 1997. Appellee correctly notes that the trial court has been divested of jurisdiction in this matter due to this court's issuance of prior stay orders in the following writs: Ramos v. Ramos, 96-818 (La.App. 5th Cir. 10/2/96) and Ramos v. Ramos, 96-917 (La.App. 5th Cir. 10/31/96). In our latest writ disposition [3] of October 2,1996 this court ordered that:
... any further hearings on custody and/or visitation be stayed pending resolution of the appeal before this court (except that the trial court may allow Christmas holiday visitation in Louisiana for a seven-day period that does not interfere with the child's school schedule) ...
Our order of October 2, 1996 only allowed the trial court to set Christmas visitation. The district court has original jurisdiction over this civil matter. La. Const. art. 5, § 16(A). At this time the trial court is precluded from exercising that jurisdiction. It is not in the minor child's best interest that the father be prevented from visitation pending the appeal. Furthermore, continuance of the stay orders would result in Gerard being denied access to the courts. La. Const. art. 1, § 22.
The appeal in this matter was submitted following oral argument on May 27, 1997. In the interest of justice we lift our previous stay orders and remand to the trial judge for further proceedings.
APPEAL
On appeal, Marianne specifies the following error:
It was error for the district court to deny defendant's motion for relocation of her minor child when defendant established, as a matter of law, good reason for the move and that the move was in the child's best interest.
*283 In Pittman v. Pittman, 94-952 (La.App. 5th Cir. 3/15/95) 653 So.2d 1211, writ denied, 95-1526 (La.9/29/95) 660 So.2d 881 this court explained at 1212:
Louisiana jurisprudence provides that a parent who has joint custody of a child, and who wants to remove the child from the court's jurisdiction, must show: (1) that there is good reason for the move, and (2) that the move is in the child's best interest [emphasis added; citations omitted].
PITTMAN: GOOD REASON FOR MOVE
The trial judge concluded Marianne had not met her burden of showing that a good reason existed for the relocation to California. We agree with appellant that the trial judge was manifestly erroneous in concluding there was no good reason for the move since the uncontroverted evidence clearly established the following: (1) Whelan had employment in California at the time of the trial; (2) Whelan's position in New Orleans was precarious; (3) both Marianne and Whalen expressed the desire to start a new life in California; (4) Both parties have no family ties in Louisiana (Marianne was originally from New York and Whelan was originally from California), and (5) Whelan and Marianne were living rent-free in the home of Whelan's parents located in Los Angeles, thereby providing them with an economic advantage not present in Louisiana. In Pittman we found good cause for the move when employment was obtained by the spouse and there was a desire on the part of the parties in that instance to start a new life. The uncontroverted evidence establishes the same herein.

PITTMAN: BEST INTEREST OF CHILD
However, the Pittman test requires a showing of both good cause and the best interest of the child and not the best interest of the moving parent. Pittman, supra. We conclude, for the following reasons, the trial judge was not manifestly erroneous in finding it was in the child's best interest to remain in Louisiana. The reasons given by the trial judge are reasonable and supported by the record.
The trial judge gave the following reasons for judgment:
... This Court finds that a move to California would not be in the best interest of the minor child due to the child's strong ties with his father and extended family members who reside within the jurisdiction of this Court.
Furthermore, this Court finds that any beneficial factors resulting from the move to California would be outweighed by the detrimental effect of the move on the child's relationship with his father.
Appellant argues it was error for the trial judge to disregard the recommendation of the court-appointed expert, Patricia Mortillaro-Percy (Percy), that the move to California was in Patrick's best interest when she was the only expert who met with the family and conducted an evaluation. However, the trial judge heard extensive testimony which included testimony from the following: (1) Elliot Levin (Levin),[4] an expert in clinical social work; (2) Dr. Debra DePrato (Dr. DePrato), an expert in child psychiatry and forensic psychiatry; (3) Dr. Karen VanBeyer (Dr. VanBeyer), an expert in clinical social work; (4) Elizabeth Dantin (Dantin), Whelan's supervisor in New Orleans;[5] (5) Whelan; (6) Marianne and (7) Gerard. The trial judge evidently attached greater weight to the testimony of Gerard and other experts to conclude that Patrick had stronger ties in Louisiana with his father and extended family members and that the move would be detrimental to the father-son relationship. The trial judge specifically referred to weighing both beneficial and negative factors associated with the move. In doing so he evidently relied on the testimony of Dr. DePrato, who explained the factors which must be weighed in determining the child's best interest. Although Dr. DePrato did not evaluate the parties and stated she *284 could not render an opinion as to whether it was in Patrick's best interest to move to California, she was nevertheless capable of providing the trial court with guidance in making that factual determination.
The second circuit considered the trial court's rejection of its court-appointed expert in a custody matter and held:
After weighing and evaluating medical and lay testimony, the trial court may accept or reject the opinion expressed by any medical expert. The weight which is to be given expert testimony is dependent upon the professional qualifications and experience of the expert and the facts upon which the opinion is based. The trial judge also has the discretion to substitute his common sense and judgment when such a substitution appears warranted upon the record as a whole [citations omitted].
Goodwin v. Goodwin, 618 So.2d 579, 586 (La.App. 2nd Cir.1993); accord, Warlick v. Warlick, 27,389 (La.App. 2nd Cir. 9/29/95) 661 So.2d 706, 710.
The "best interest of the child" determination is within the exclusive province of the trial court. W.M.E. v. E.J.E., 619 So.2d 707, 711 (La.App. 3rd Cir.1993). The W.M.E. court held at 711 that:
... the ultimate `best interest of the child' decision squarely remains in the exclusive province of the court. This decision necessarily focuses on all of the evidence and testimony presented. The trial court is not bound to follow the recommendations of an expert witness [emphasis added].
"The trial judge, as the trier of fact, is clearly within his discretion to accept or reject in whole or in part the testimony of expert witnesses." L & R. Leasing Co., v. Allstate Ins. Co., 561 So.2d 1011, 1014 (La. App. 4th Cir.1990).
Percy evidently concluded the pending motion was a motion as to whether Marianne would be allowed to leave the state. Her written recommendations were introduced into evidence. She recommended that Patrick's mother be the domiciliary parent in the joint custody arrangement and that Patrick be in her custody "where ever[sic] she lives out of state." It is evident from this recommendation that the child's best interest was not considered since a blanket recommendation that it would be in the child's best interest to live in any state in which the mother resided fails to take into account the child's feelings and needs. Thus, Percy's recommendation focuses on the best interest of the parent rather than the best interest of the child. The trial judge is "restrained from following an expert's recommendation when to do so would be contrary to law." W.M.E., supra at 711.
Here the trial judge made a credibility determination. The Supreme Court explained in Mistich v. Volkswagen of Germany, Inc., 95-939 (La.1/29/96) 666 So.2d 1073, 1077-1078, opinion reinstated on rehearing, 95-939 (La.11/25/96) 682 So.2d 239:
In our three-tiered judicial system, findings of fact are allocated to the trial courts. It is a well settled principle that an appellate court may not set aside a trial court's finding of fact unless it is clearly wrong. Where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. Rosell v. ESCO, 549 So.2d 840 (La.1989); Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). Where two permissible views of the evidence exist, the factfinder's choice between them cannot be manifestly wrong. Rosell, supra at 845; Watson v. State Farm Fire & Casualty Ins. Co., 469 So.2d 967 (La.1985); Arceneaux, supra at 1333. Where the factfinder's conclusions are based on determinations regarding credibility of the witnesses, the manifest error standard demands great deference to the trier of fact, because only the trier of fact can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. Rosell, supra at 844. The reviewing court must always keep in mind that if a trier of fact's findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse even if convinced *285 that if it had been sitting as trier of fact, it would have weighed the evidence differently. Stobart v. State, Through DOTD, 617 So.2d 880 (La.1993); Housley v. Cerise, 579 So.2d 973 (La.1991); Sistler v. Liberty Mutual Ins. Co., 558 So.2d 1106 (La.1990) [emphasis added].
For the reviewing court, the issue to be resolved is not whether the trier of fact was wrong but whether the factfinder's conclusions were reasonable. Stobart, supra at 883; Theriot v. Lasseigne, 640 So.2d 1305 (La.1994). Moreover, where the testimony of expert witnesses differ, it is the responsibility of the trier of fact to determine which evidence is most credible. Sistler, supra, at 1111; Theriot, supra at 1313. This language places the responsibility of determining which expert was more credible on the trial judge ... This court announced a two-part test for reversal of a factfinder's determination:
(1) The appellate court must first find from the record that a reasonable factual basis does not exist for the finding of the trial court, and
(2) the appellate court must further determine that the record establishes that the factfinder is clearly wrong (manifestly erroneous).

Stobart, supra at 882; Mart v. Hill, 505 So.2d 1120 (La.1987).
The trial judge's factual findings are reasonable considering the entire record. He questioned Dr. DePrato with regard to her earlier testimony on the factors to consider in determining the best interest of the child. He asked Dr. DePrato, assuming there is no abuse, how it could ever be in the best interest of the child to be moved from his extended family. During oral argument before this court, appellant's counsel argued that this question by the trial judge indicated he had a presumption against relocation. We disagree. Our review of the entire colloquy between the trial judge and Dr. DePrato reveals the trial judge's recognition that a number of issues are involved in a relocation case. Additionally, he also asked Dr. DePrato, "[a]ssuming the Court would allow the relocation to California, what types of things would you do to keep that relationship good with the father." The colloquy reflects the trial judge's concern about considering all of the factors necessary in a relocation case. It is apparent he did so when he referred in his judgment to weighing factors.
Percy viewed the move as a means of decreasing the acrimony between the divorced parties and thereby serving Patrick's best interest. She explained that both parties have anger and animosity toward the other and that there is no effort to coparent amicably. However, Dr. DePrato testified that moving away is not the "number one" way of decreasing a conflict. She stated that post divorce conflict is common and that whenever there is a legal battle, conflict is high. Dr. DePrato testified she has worked with extremely conflicted situations and seen improvement. One solution is to have a therapist for both parents.
Additionally, despite Percy's conclusion the parents cannot coparent, she recommended joint custody, which necessarily required coparenting.
Dr. DePrato testified that the factors to consider in a relocation case are: (1) the location to which the child would be moving, and the extent of his association with that location; (2) the presence of a support system in the proposed location; (3) the age of the child, since the loss of relationships may have more of an impact on a younger child; (4) parenting abilities; (5) the ability of the child to handle transition in general; (6) the attachment of the child to the neighborhood, his friends, the community, the school, and the significant others in his life at that location; (7) the significant people in the child's life, since he would be losing a support system, and (8) the ability of the primary custodian to foster and maintain the child's relationship with the non-custodial parent.
Dr. DePrato stated it was more important in a relocation case than in a custody case that the custodial parent encourage the relationship with the non-custodial parent. She testified that research has shown that the loss of a father is more stressful in boys than in girls.
The trial judge's factual finding that Patrick had strong ties to both his father *286 and to extended family members here in Louisiana is amply supported by the evidence. Although Marianne testified Gerard had a nonexistent relationship with his son, Percy testified otherwise. Percy observed Gerard's interaction with his son for approximately 45 minutes. She stated Patrick was comfortable with his father and that Gerard was gentle with his son. She testified the interaction indicated a close, warm, and loving relationship between them. Percy concluded Patrick was attached and bonded to his father.
John Ramos (John), Gerard's nephew, lived in the home with Patrick, Gerard and Marianne following the death of John's parents. Marianne testified John came to live with them when Patrick was seven months of age. At that time John was nine years of age. She stated John lived with her for four and one-half years. Marianne testified Joyce Ramos (Joyce), Gerard's mother, filed for custody of John. The court-appointed expert determined it was in John's best interest to live with his grandmother and Gerard. Marianne stated she agreed to the recommendation.
Marianne testified that Patrick and John had a relationship at one time and that they still had a relationship at the time of trial. However, she described the current relationship as one which was not a close one. She testified that John and Patrick were "like brothers" until "they took John from me." She did admit that Patrick's relationship with John was still important but felt the move to California would increase the amount of time John interacted with Patrick because John would make an effort to stay at home on the visitation and not leave to go to a girl friend's house. She also thought Joyce would let John visit in California. She stated that Joyce loved Patrick.
In contrast, Gerard testified the relationship between John and Patrick is still very close and that Patrick considers John to be his "brother." Gerard also testified that when he has had visitation with Patrick, John is included in activities.
Gerard explained that John and his older brother, Ricky Ramos (Ricky), live with him and Joyce. He described the relationship between Patrick and Ricky as one in which they are "almost like brothers." Ricky has taken care of Patrick on past yearly vacations with their paternal grandmother. Patrick and Ricky also play on the computer together. Gerard described his family as very close.
Gerard has two sons from a previous marriage who visit him in Louisiana. They were ages 16 and 14 at the time of trial. Both reside in Atlanta, Georgia with their mother. His sons continue to visit him in Louisiana. Marianne testified she, Gerard and Patrick would go on soccer trips with the two boys. She also stated she often went alone with the boys on these trips. Gerard testified differently. He stated he went on 30 to 40 soccer trips during the marriage. He testified that on one occasion Marianne went alone with Patrick. Marianne admitted that Patrick has a relationship with his two half-brothers, but stated that Patrick could see them when he came to Louisiana to visit his father. However, she testified that on a recent Easter holiday when Patrick's half-brothers were in town for a visit, she did not give Gerard the entire Easter day but split it based on the amount of holiday time Gerard had previously.
Appellant argues that the trial judge's reasons for finding best interest was that Patrick's Louisiana family's time would not be impaired, and as such does not meet the "best interest" test. However, the trial judge focused on the "strong ties" with his father and extended family members as well as the detrimental effect of the move on the father-son relationship. Appellant further argues Patrick has a new extended family in California with Whelan's parents. However, Patrick has not had the long-term relationship with the stepfather's family as he has with his paternal grandmother, cousins, and half-brothers who visit in Louisiana.
The trial judge also concluded after weighing the evidence that the child's move to California would be detrimental to the father-son relationship. Dr. DePrato testified one of the "prime" things to consider is that the person who is taking the child make it a point to maintain the relationship between *287 the child and the other parent. Percy also testified it was important for Patrick to remain close to his father. The trial judge evidently determined that the relationship between Patrick and his father would be impaired due to the move.
Appellant argues the trial judge based his determination on the fact that the father's visitation would change. However, as mentioned previously, the trial judge gave careful thought to the best interest of the child. His questioning of Dr. DePrato indicated he was particularly concerned about the custodial parent's fostering the relationship. He evidently concluded that Marianne's actions demonstrated a failure to encourage or foster the father-son relationship.
Marianne testified she would do anything and sign any agreement to encourage visitation with Gerard. Levin testified that Marianne, Patrick, and Whelan went to him for the purpose of devising a visitation plan to ensure Patrick's relationship with Gerard would not be harmed. Levin testified he believed Marianne was sincerely interested in setting up such a visitation schedule. He presented an unreasonable and extreme plan. He stated most people would have left his office at such a suggestion but Marianne and Whelan considered it. He ultimately recommended that Gerard have Patrick 40% of the time. This plan entailed Gerard's having summer visitation and almost all of the entire holidays. Levin stated Marianne was agreeable to this plan.
However, at trial, Marianne testified Levin also recommended that Patrick be flown back every six weeks at her expense. She stated she told Levin she agreed to this, but she did not take this as a "recommendation" and did not know if she and Whelan could afford to do so due to court expenses.
Although Levin viewed Marianne as committed to his recommendations, the evidence reveals Marianne's agreement was subject to qualification. Despite Levin's recommending they pay for the air fare and his receiving assurance they would do anything to foster the relationship, Marianne and Whelan afterwards decided to ask that the expenses be split. Whelan stated it was because of the cost of the litigation. However, at the time the parties saw Levin they were already in this litigation when they assured him they would pay these costs.
Importantly, Gerard testified that since May 17, 1996 visitation was alternating three-week periods. He stated he asked Marianne to allow Patrick to stay with him until Marianne flew back with Whelan after a court date so that Patrick did not have to ride a plane alone for four and one-half hours. This would mean Patrick would spend four extra days with Gerard. Marianne refused on the basis Patrick was starting kindergarten that week. However, Patrick did not start school until the following week. The trial judge evidently considered this request by Gerard to reflect Gerard's sincerity in his concern for this preschool child's needs.
Marianne and Whelan testified that Whelan is not attempting to replace Gerard as Patrick's father. Whelan stated he viewed his role as a role model for Patrick. Introduced at trial was a boarding pass made out to "Patrick Whalen." Gerard testified he had difficulty placing his son on the plane to California because of the different name. Patrick has been referring to his stepfather as "daddy" even before the marriage. Neither Marianne nor Whelan indicated they asked Patrick to call Whelan anything else despite the fact they testified Whelan did not want to replace Patrick's father.
Gerard also testified that when Marianne left the family home she took all of the photographs of Patrick, leaving none for him to remember his son. He introduced photographs at trial, which he obtained from others, showing his participation in Patrick's life.
Whalen admitted he told Dantin that Patrick has a poor relationship with his father. Marianne testified Gerard was unattached to Patrick and never did anything for him. However, Percy testified Patrick was attached to his father and had a good relationship. Both Marianne and Whelan attempted to convey to the court and others that Gerard did not have an attachment to his son. The court evidently was concerned that their negative view toward the relationship, in view of *288 evidence which showed otherwise, could impair the relationship between Gerard and his son.
The trial judge was evidently mindful of the evidence that Patrick has an attachment to his mother and stepfather as well as the fact that he shows no signs of emotional problems. However, after weighing the benefits of continued residence with the mother in her move to California against the failure of the mother and the stepfather to encourage or foster the father-son relationship, as well as Patrick's strong ties in Louisiana, we cannot say that he was clearly wrong or manifestly erroneous in concluding removal of Patrick to California was not in Patrick's best interest.
Accordingly, the judgment denying Marianne Murdock Ramos' motion to take the minor child out of the state is affirmed at appellant's cost. IT IS ORDERED that the stays issued by this Court on October 2, 1996 and October 31, 1996 be and are hereby lifted. Gerard W. Ramos' motion to set Summer visitation is remanded to the district court for further proceedings consistent with the views expressed herein.
AFFIRMED; STAY ORDERS LIFTED; MOTION TO SET SUMMER VISITATION REMANDED.
NOTES
[1] Gerard also filed a motion to change custody so that he be awarded primary custody of the minor child should the court find that relocation was not in the best interest of the minor child.
[2] Prior to trial Marianne was allowed to remove the minor child from the state subject to a visitation schedule. A dispute arose which resulted in writ applications before this court discussed infra.
[3] The Supreme Court, on November 22, 1996, ordered this court to expedite consideration and action of the appeal and otherwise denied the writ application. Ramos v. Ramos, 96-2748 (La.11/22/96) 683 So.2d 295.
[4] Levin did not identify himself as "Dr. Levin" when he was sworn in at trial. Appellant refers to him as "Dr. Levin" in the brief.
[5] Dantin's deposition taken April 25, 1996 was introduced at trial.